**William J. CATHERS,**
**Employee-Appellant,**

v.

**MONARCH PRODUCTS, INC.,**
**Employer-Respondent.**

No. 41921.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 26, 1980.

Morris B. Kessler, St. Louis, for employee-appellant.

Emil J. Kohl, St. Louis, for employer-respondent.

DOWD, Presiding Judge.

An employee appeals from the trial court's affirmance of the decision of the Labor and Industrial Relations Commission denying benefits to the appellant.

The contested issues at the administrative hearing were limited, but included the issues of medical causation between the accident and claimed injuries, the extent of temporary total disability, and the extent of permanent partial disability. A concomitant issue was whether the accident occurred in the manner claimed by the employee.

At the administrative hearing, the employee testified that on May 14, 1976 he was injured when struck across his upper back and right arm and knocked to the ground by a falling couch frame which the employee had assembled and stacked above two other frames on a rolling dolly. The employee testified he attempted to continue working but that he became ill and that his arm became swollen. He approached his supervisor and told him " 'Something's got to be done.' " After resting a short time, the employee said he complained to Mr. Sher, the president of the company, and left work at about 2:30 on the day of the accident after having been told to use an ice pack on his arm. The employee said he returned to work the next morning, a Saturday, and saw Mr. Sher who told the employee to go home and use an ice pack on the arm after Mr. Sher looked at it. The employee testified he contacted Mr. Sher the Friday following the accident when the employee came for his paycheck. He claimed he told Mr. Sher that " 'Something's got to be done' ", that he would have to go to a doctor. The employee testified he came and spoke to Mr. Sher on several subsequent occasions, making complaints of his injuries, but that Mr. Sher never offered to send the employee to a doctor. The employee testified he has not been employed since the accident.

The employee did not see a doctor until he was sent to one by his attorney on July 23, 1976. At the time of the hearing, he had not been treated since September 27, 1976, but the employee complained of continuing neck, back, shoulder, and elbow problems arising out of the accident. Additionally, the employee complained a prior injury to his left leg had been aggravated.

The report of the doctor who treated the employee from July until September, 1976 indicated the employee:

". . . has sustained severe sprains to the cervical spine extending to the right upper extremity. These sprains are accompanied by ligamentous instability and localized nerve root irritation with resultant pains.

There is arthritic irritation evident.

Lumbar spondydlothesis (Grade II).

In my opinion, these injuries are of a permanent nature.

## PROGNOSIS

Due to the extreme structural weakness of the cervical spine, traumatically induced, and the neurological defects manifested, it is apparent that the patient's symptoms are going to be recurrent. He can expect intermittent exacerbations of pain and stiffness in the cervical region, the right arm, and possibly the right hand. He will require palliative treatment. In view of this, I would rate his disability at 25 per cent of the man as a whole."

The report of another of the employee's medical witnesses noted the employee's discomfort in his neck, upper right extremity, right elbow, and lower back; weakness of the right grip; flattening of the lumbar curvature; and diminished sensation of the left leg and foot. X-rays revealed degenerative changes in C5–6 and C6–7 areas of the cervical spine and narrowing of the L5 S1 intervertebral disc space in the lumbar spine. The employee was diagnosed as having:

"1. Lumbosacral strain, chronic.
2. Herniated disc L5 S1, suspected.
3. Cervical strain, chronic.
4. Degenerative arthritis cervical spine.
5. Soft tissue injury of right upper extremity with residual weakness.
6. Old gunshot wound left leg with peroneal nerve loss.

## CONCLUSION:

In my opinion, this patient has a permanent partial disability of 20% of the man as a whole as result [sic] the problem of his neck. Of this I would rate 5% as preexisting the injury and 15% as due to the injury of May 14, 1976. I would further rate a permanent partial disability due to the accident of May 14, 1976 of 20% of the man as a whole as a result of the problem of his lumbar area, and 20% of the right upper extremity of the shoulder. I would further rate a permanent partial disability of 20% of the left lower extremity at the knee as a result of the pre-existing injury.

I would further state that due to the multiplicity of this gentleman's symptoms he has a disability which is greater than the simple total of the above rated disabilities, and I would therefore add a loading factor of 10% of the man as a whole."

Evidence by the respondents at the administrative hearing was that the conceded accident had caused only a slight injury to the employee's elbow. No witnesses saw the employee injured, but one of appellant's co-employees testified appellant told the witness, probably on the date of the accident, the appellant had been hurt around his elbow. The witness said the appellant exhibited his elbow and said it was swollen although the witness could not see any difference. The witness saw the appellant at a bar a week or two later, and the appellant complained of a skinned elbow which the witness saw. The witness stated he did not recall the employee making complaints other than about this elbow.

Additionally, appellant's supervisor testified the employee never approached his supervisor to complain of injuries on the day of the accident or the following morning, as claimed by the employee. The witness said he first learned of the accident a week later when the employer came to pick up his paycheck. At that time, the employee claimed he had hurt his elbow, but the witness could not see any injury. The witness told the employee to speak to Mr. Sher about returning to work because the employee had been unexplainably absent in excess of three days contrary to the employer's rule that such conduct terminated employment. The witness did not see or talk to the employee thereafter until the administrative hearing.

Mr. Sher also testified. He stated the employee was a good assembler but that the employee's attendance was irregular, coming to work late, leaving early, and quitting without notice for approximately three months before returning to work early in the month of his injury. Mr. Sher testified the employee told him he had bumped his elbow on a frame in the late morning on the day of the accident. The employee did not

make other complaints or ask for treatment, and Mr. Sher could not see anything wrong with the elbow. At approximately 2:30 p. m., the employee told Mr. Sher his arm hurt and he was going home to soak it in ice water. Mr. Sher did not send the employee for medical treatment because the employee's elbow did not appear to require it, nor did the employee request medical treatment. Mr. Sher stated he did not see the employee again the next morning and that he rarely works Saturday. He did not see or speak to the employee again until the hearing. Neither the employee nor his attorney requested medical treatment from him.

The report of respondent's medical witness noted the history given by the employee and some of the physical observations also made by the employee's doctors and concluded:

"This man presents with history and complaints as noted. The subjective complaints are far out of proportion to what would be expected and he demonstrates many bizarre findings on physical examination. X-rays show degenerative arthritis involving the cervical spine and degenerative disc disease involving the lumbosacral disc but otherwise are negative. *On the basis of the history and subjective complaints* [emphasis added] this man probably sustained a soft tissue injury to his neck and back aggravating the preexisting degenerative changes. On this basis I would estimate the residual disability at no more than 5% of the patient and from an orthopaedic standpoint I can find no reason why this man should not be able to return to work."

Upon the foregoing evidence, the referee found the employee's testimony not credible and that the credible evidence failed to establish,

"(1) that claimant sustained injury to any part of his body other than his right elbow as a result of the May 14, 1976, accident; (2) that the injury to claimant's right elbow rendered him temporarily totally disabled; (3) that the treatment claimant obtained from Dr. Croft was

needed medical treatment resulting from the May 14, 1976, accident that the employer/insurer failed or refused to provide; or (4) that as a result of said accident, claimant needs future medical treatment for which responsibility rests with the employer/insurer."

The referee denied benefits, and the denial was affirmed by the Commission and the trial court.

Upon appeal, the employee argues the Commission's denial of benefits was not supported by and contrary to the evidence because all of the medical evidence at the hearing was that the employee's conceded accident had caused total temporary and permanent partial disability. The employee also argues the evidence does not support or contradicts the denial of benefits because the employer, although notified of an accident, did not furnish medical aid thereby entitling the employee to reimbursement for the reasonable cost of his medical treatment.

█ Here, the evidence is in direct conflict as to what complaints were made by the employee and what notice the employer had of injuries claimed. Although the employee would have to walk through the plant a short distance to get to Mr. Sher's office, no disinterested witnesses testified to prove or disprove the contention the employee saw Mr. Sher numerous times seeking aid. Any conflicts in the evidence and the credibility and weight of the witnesses' testimony are for the Commission's determination. Its findings in that regard are conclusive upon the reviewing court. *Taliaferro v. Barnes Hospital*, 586 S.W.2d 429, 431[1–2] (Mo.App.1979); *Berardino v. Gen'l Molding, Inc.*, 586 S.W.2d 365, 366 (Mo.App. 1979).

█ We disagree with the employee's assertion the medical evidence uniformly opined the employee's health problems were caused by the conceded accident. The report of respondent's medical witness notes a probable soft tissue injury but only upon an assumption the history given by the employee is true. Indeed, the report found the employee's complaints exaggerated and bi-

zarre. Generally, the medical opinions were in conflict as to the nature and extent of the employee's problems, and the Commission was free to choose between conflicting opinions. *Berardino v. Gen'l Molding, Inc., supra.*

Based upon the instant record, we might well have drawn different conclusions than the Commission. However, such is not our standard of review. Having reviewed the record and the legitimate inferences therefrom in a light most favorable to the findings and award of the Commission, we find the denial of benefits supported by substantial competent evidence and not contrary to the overwhelming weight of the evidence. *See, Taliaferro v. Barnes Hospital, supra; Berardino v. Gen'l Molding, Inc., supra.*

The trial court's judgment affirming the Commission's award is affirmed.

CRIST and REINHARD, JJ., concur.